Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SITI AISHAH RIDZUAN

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SITI AISHAH RIDZUAN, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>THE CONTAINER STORE, INC., a Texas Corporation,<br><br>Defendant. | Case No: 3:26-cv-00619-EMC<br>Judge: Hon. Edward M. Chen<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1) 18 U.S.C. § 2511<br>2) Cal. Penal Code § 631<br>3) Cal. Penal Code § 638.51<br>4) Cal. Constitution Art. I § 1<br>5) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>6) Intrusion Upon Seclusion<br>7) Unjust Enrichment |

Plaintiff SITI AISHAH RIDZUAN ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant THE CONTAINER STORE, INC., a Texas Corporation ("Defendant" or "THE CONTAINER STORE"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used **www.containerstore.com** (the "Website"), a website that Defendant provides for public access and use.

2. Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data. In doing so, Defendant's tracking technologies intercept the substance of users' browsing communications, including the specific articles, blog posts, and product pages each user views, and transmit those contents alongside persistent identifiers to third-party advertising and analytics companies in real time.

3. To achieve these goals, Defendant enables third-party technologies on its Website that perform two distinct categories of unlawful surveillance:

- First, these technologies intercept the contents of users' electronic communications with the Website by capturing and transmitting to third parties the full, human-readable URLs identifying specific content the user is reading, including blog articles addressing cultural topics such as Juneteenth, Black History Month, and Pride Month, along with product category data, structured event metadata describing specific user interactions, and in one instance, the user's IP address as an explicit application-layer parameter. These transmissions occur in real time, are

paired with persistent tracking identifiers, and are made without the knowledge or consent of the user, in violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, and the federal Wiretap Act, 18 U.S.C. § 2511.

- Second, the same technologies also function as unlawful pen registers and/or trap-and-trace devices or processes by automatically capturing and transmitting non-content dialing, routing, addressing, and signaling ("DRAS") information, including Internet Protocol addresses, referrer headers, timestamps, session identifiers, and device or browser identifiers, to third-party servers in real time during users' interactions with the Website. Defendant deploys these technologies without judicial authorization and without obtaining Plaintiff's or Class Members' consent, in violation of CIPA, Cal. Penal Code § 638.51

4. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

5. When triggered, the pixel causes the user's browser to transmit data to third-party servers. The transmitted data includes both the contents of the user's communications with the Website, such as the full URLs identifying the specific articles, blog posts, product pages, and category pages the user is viewing, as well as structured event data describing the user's interactions with that content, and non-content DRAS information, including referrer headers, session-level identifiers, network-level IP addressing information, browser and device characteristics, and related navigation metadata. These transmissions occur automatically, without any visible indication to the user, and before the user has an opportunity to provide or withhold consent.

6. The Website's third-party trackers also transmit the user's IP address as an explicit parameter within tracking requests sent automatically during page load. In one

such workflow, a tracker operated by Dotomi, a division of Epsilon Data Management, LLC, transmits the user's public IP address as a named parameter (dtm_user_ip) alongside the full content URL the user is viewing (canonical_url), device and browser information (dtm_user_agent), geolocation data (dtm_state), and persistent identifiers stored in Dotomi cookies (DotomiUser, DotomiSession, DotomiConsent). In a separate workflow, the Website transmits the user's IP address as an explicit parameter within a tracking request associated with persistent AGKN cookies identified as "ab" and "u," together with headers such as Referer, Origin, User-Agent, and Accept-Language. In both instances, the user's IP address, the substance of what the user is reading, device information, and stored identifiers are transmitted together to third-party infrastructure without user consent, reflecting deliberate, application-layer data collection rather than routine network-level use of an IP address for routing purposes.

7. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Analytics / Google Ads / DoubleClick Trackers
- Facebook / Meta Pixel Tracker
- Pinterest Tracker
- Dotomi Tracker
- Adobe Tracker
- TikTok Tracker
- AGKN Tracker

8. The third parties that operate the tracking technologies embedded in the Website collect and receive both the contents of users' communications with the Website and User Information (defined below) generated by visitors' interactions with the Website, and use that information for their own independent commercial purposes. As alleged herein, these third parties participate in advertising, analytics, audience-measurement, and data-profiling ecosystems that extend beyond Defendant's internal website operations. The information collected through the Website is used by these third

parties to support functions such as measurement, attribution, audience segmentation, and data monetization for their own benefit. The tracking technologies described above are referred to collectively as the "Trackers."

9. The Trackers are operated by distinct third parties, including Google LLC (as to Google Tag Manager, Google Analytics, and Google Ads/DoubleClick tracking technologies), Meta Platforms, Inc. (as to the Facebook/Meta Pixel), Pinterest, Inc. (as to the Pinterest Tag and related tracking technologies), Dotomi, a division of Epsilon Data Management, LLC (as to Dotomi visit-profiling and IP-collection technologies), Adobe Inc. (as to Adobe Launch, Adobe Analytics, and Adobe Audience Manager/Demdex), TikTok Inc. (as to TikTok tracking and analytics technologies), and AGKN/AdGear (as to AGKN pixel and audience-graph tracking technologies) (collectively, the "Third Parties"). Defendant knowingly enables and deploys these Trackers on the Website and causes them to execute automatically within users' browsers upon page load and navigation. In doing so, Defendant causes two categories of unlawful data collection. First, certain Trackers intercept the contents of users' electronic communications with the Website, including the full, human-readable URLs identifying specific articles, blog posts, product pages, and category pages the user is viewing, as well as structured event data describing the user's interactions with that content, and transmit those contents to servers controlled by the Third Parties in real time, paired with persistent identifiers that link the intercepted content to specific browser instances. Second, the Trackers capture and transmit non-content dialing, routing, addressing, and signaling ("DRAS") information, including referrer headers, timestamps, session-level and persistent identifiers, browser and device characteristics, locale and language signals, and related network metadata, to servers controlled by the Third Parties for purposes including advertising measurement, attribution, analytics, audience segmentation, identity-linked tracking, and data profiling. Defendant's conduct is intentional and coordinated, as these Trackers operate pursuant to Defendant's configuration and are not necessary to render the Website's core content or functionality.

10. Through the Trackers, the Third Parties collect a wide range of information from users' browsers and devices without prior user authorization. This information includes, first, the contents of users' communications with the Website: full, human-readable URLs that identify the specific articles, blog posts, product pages, and content categories the user is viewing, including content addressing culturally sensitive topics; product category and subcategory data transmitted as structured parameters; and event metadata describing the nature of the user's interaction with specific content, such as page views, product views, and navigation events. This information also includes, second, non-content DRAS data: Internet Protocol ("IP") addressing information (transmitted implicitly at the network layer and, in the case of the Dotomi and AGKN Trackers, explicitly embedded as a named request parameter), page referrer headers, browser and device type, operating system and platform information, language and locale settings, persistent and session-level identifiers (including cookies and advertising or deduplication identifiers), and other navigation-related metadata transmitted during page load and site interaction. The Trackers also enable the derivation of approximate geographic location from IP addressing information. Collectively, this data ("User Information") is used for behavioral profiling, advertising measurement and attribution, personalization, audience segmentation, and identity-linked tracking. Defendant deploys the Trackers and permits the collection and commercial use of User Information in coordination with the Third Parties operating them to support targeted marketing and advertising that monetizes the Website.

11. The third-party tracking code executed automatically during each page load and navigation event initiated by Plaintiff's browser. As pages were loaded and rendered, embedded scripts executed in parallel with the retrieval of Website content and caused the automatic transmission of both content and DRAS information to remote third-party endpoints during the page-load process itself. These transmissions occurred before the page finished rendering and without any user interaction, notice, or authorization.

/ / /

12. Because the Trackers intercept and transmit the contents of users' electronic communications with the Website, including the full URLs identifying specific content the user is reading and structured event data describing the user's interactions with that content, they constitute unauthorized wiretapping in violation of California Penal Code § 631 and the federal Wiretap Act, 18 U.S.C. § 2511. The contents intercepted by the Trackers reveal the substance of what each user is reading, viewing, and doing on the Website, and are transmitted to third parties in real time alongside persistent identifiers that allow the Third Parties to associate the intercepted content with specific browser instances across sessions. These interceptions occur without the consent of the sender or the intended recipient of the communication, and without judicial authorization.

13. Additionally, because the Trackers record and transmit DRAS information, including Internet Protocol addressing information, referrer headers, persistent and session-level identifiers, and browser and device characteristics, they operate as "pen registers" and/or "trap and trace devices or processes" within the meaning of California Penal Code §§ 638.50 and 638.51. These technologies function as automated processes that collect routing and addressing metadata for commercial purposes during page load and navigation, without the user's knowledge or consent. Courts have recognized that the unauthorized deployment of tracking technologies to capture routing, addressing, and signaling information of this nature falls within the scope of CIPA's prohibitions. *See, e.g.*, *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

14. The privacy intrusion alleged herein is heightened by the nature of the third-party entities that operate the Trackers and receive Plaintiff's and Class Members' communications and User Information. As alleged above, Defendant causes users' browsers to transmit the contents of their browsing communications, together with Internet Protocol addressing information, persistent and session-level identifiers, page URLs, referrer headers, device and browser characteristics, and related signaling data, to commercial advertising, analytics, identity-resolution, and audience-measurement platforms operated by Google LLC, Meta Platforms, Inc., Pinterest, Inc.,

Dotomi/Epsilon Data Management, LLC, Adobe Inc., TikTok Inc., and AGKN/AdGear. These third parties operate large-scale commercial systems designed to collect, process, and correlate user data across multiple web properties for purposes including advertising measurement, attribution, analytics, audience segmentation, and data monetization. By enabling these Trackers, Defendant permits third parties to intercept, record, analyze, and commercially exploit the contents and navigation activity of users' communications associated with Defendant's Website, without Plaintiff's consent and without any court authorization, in violation of California Penal Code §§ 631 and 638.51 and 18 U.S.C. § 2511.

15. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices. During Plaintiff's visit, the Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying wiretapping, pen-register, or trap-and-trace devices or processes. Defendant did not obtain express prior consent for the interception of the contents of users' communications or for the automated collection and transmission of DRAS information for advertising, analytics, or data-monetization purposes. General disclosures contained in a privacy policy accessible only through non-blocking hyperlinks do not constitute express prior consent under California law.

16. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II. PARTIES

17. Plaintiff SITI AISHAH RIDZUAN is a California citizen residing in Contra Costa County and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on December 2, 2025. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

/ / /

18. THE CONTAINER STORE, INC. is a Texas corporation that owns, operates, and/or controls the Website, an online platform through which THE CONTAINER STORE offers goods and services to consumers.

19. THE CONTAINER STORE is a retailer specializing in storage, organization, and custom space-management products for residential and commercial use. THE CONTAINER STORE is organized under the laws of the State of Texas and maintains its principal executive offices in Coppell, Texas. Through its retail locations and digital channels, THE CONTAINER STORE markets and sells organization products and related services to consumers throughout the United States.

20. THE CONTAINER STORE conducts business nationwide and engages in extensive merchandising, marketing, and commercial operations centered on its retail and e-commerce platforms. A substantial component of THE CONTAINER STORE's business model involves digital marketing, online sales, and data-driven consumer engagement, including the use of web-based technologies to promote products, analyze user behavior, optimize conversions, and drive sales.

21. The Website, including the mobile site, serves as a core component of THE CONTAINER STORE's digital presence. The Website provides consumers with access to product catalogs, category and promotional content, custom-design and planning tools, account and checkout functionality, and customer-service resources, and functions as a primary consumer-facing platform through which users browse and purchase products. The Website is integrated into THE CONTAINER STORE's broader digital marketing and analytics infrastructure, and THE CONTAINER STORE deploys tracking and measurement technologies on the Website to monitor page loads, navigation, and user interactions for advertising, attribution, analytics, and performance-measurement purposes.

## III. <u>JURISDICTION AND VENUE</u>

22. This Court has original subject matter jurisdiction over Plaintiff's federal Wiretap Act claim pursuant to 28 U.S.C. § 1331, as the claim arises under 18 U.S.C. §

2511. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts as the federal claim. This Court also has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of another state.

23. THE CONTAINER STORE operates a nationwide, consumer-facing e-commerce platform through which it markets and sells storage, organization, and custom space-management products to consumers throughout the United States, including California. The Container Store's Website is designed to attract, monetize, and retain users through digital marketing, advertising attribution, analytics, and audience measurement, and THE CONTAINER STORE affirmatively conducts business with California residents by offering products for sale to California consumers and by accepting California billing and payment information in the ordinary course of business.

24. The Website is expressly designed to drive consumers to its more than ten California retail locations. Through that site, Defendant maintains a California-specific store locator and state-focused location pages, promotes in-store and curbside pickup tied to particular California stores, and encourages customers to complete purchases and services through those brick-and-mortar locations. By using its website as a primary channel to solicit business from California residents and to steer online visitors into its California stores, Defendant has purposefully availed itself of the privilege of conducting business in California and has deliberately targeted this forum and its consumers.

25. In connection with these commercial activities, THE CONTAINER STORE deliberately integrates a multi-vendor advertising, analytics, and identity-tracking ecosystem into the operation of its Website. That ecosystem includes tracking and measurement technologies operated by Google LLC, Meta Platforms, Inc., Pinterest, Inc., Dotomi (a division of Epsilon Data Management, LLC), Adobe Inc., TikTok Inc.,

and AGKN/AdGear, each of which provides commercial platforms whose ordinary function is to collect, process, and monetize the contents of users' browsing communications and the dialing, routing, addressing, and signaling information associated with users' navigation of commercial websites.

26. The advertising, analytics, and identity platforms selected and deployed by THE CONTAINER STORE are not passive or incidental service providers. Google's analytics and advertising systems, Meta's marketing and analytics infrastructure, Pinterest's advertising measurement and conversion-tracking platform, Dotomi's visit-profiling and IP-collection infrastructure, Adobe's Experience Cloud and Audience Manager services, TikTok's advertising measurement platform, and AGKN's audience-graph services all depend on the automated capture and transmission of the contents of users' browsing communications and addressing and signaling information, including full page URLs identifying the specific content users are viewing, IP addressing information, referrer headers, timestamps, and persistent identifiers, in order to recognize users, correlate browsing activity across sessions or domains, perform attribution and analytics, and support advertising and data-monetization functions. By embedding these technologies into the ordinary operation of its Website, THE CONTAINER STORE knowingly enables the interception and downstream commercial use of both the contents and the routing metadata of users' electronic communications.

27. Many of the third-party platforms on which THE CONTAINER STORE relies maintain substantial and well-documented operational ties to California. Google LLC and Adobe Inc. are headquartered in California and maintain core engineering, advertising, and analytics operations in the state. Meta Platforms, Inc. is headquartered in Menlo Park, California and operates significant advertising, analytics, and data-processing functions through multiple California campuses and offices. TikTok maintains major U.S. offices in Los Angeles, California that support its advertising and platform operations. Pinterest, Inc. is headquartered in San Francisco, California and manages key advertising, engineering, and analytics functions from its California

offices. Epsilon Data Management, LLC, the parent entity of the Dotomi division, conducts data-driven marketing activities involving California consumers and is registered with the California Attorney General as a data broker. These entities also rely on large-scale cloud, content-delivery, and network infrastructure that includes data centers and internet exchange points in California as part of their ordinary U.S. operations.

28. THE CONTAINER STORE's decision to integrate these vendors reflects a knowing and sustained engagement with an advertising and data-monetization ecosystem that is deeply rooted in California. The interception of the contents of users' browsing communications and the transmission of users' dialing, routing, addressing, and signaling information to these platforms is not an unintended byproduct of internet communication, but the foreseeable and intended consequence of THE CONTAINER STORE's configuration choices, which enable analytics, attribution, identity recognition, and audience modeling. Through this architecture, information generated by California users accessing the Website is routed into commercial systems operated by companies with substantial operational presence in California, where that information is processed, analyzed, and monetized.

29. Taken together, THE CONTAINER STORE's operation of a nationwide e-commerce platform serving California consumers, its deliberate and ongoing integration of advertising, analytics, and identity-tracking technologies operated by companies with substantial California ties, and its knowing facilitation of the interception of the contents of users' browsing communications and the collection and commercial use of California users' dialing, routing, addressing, and signaling information establish that THE CONTAINER STORE purposefully directed its data-collection and advertising activities toward California residents. The exercise of personal jurisdiction over THE CONTAINER STORE in this forum is therefore consistent with due process and California law.

/ / /

30. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Plaintiff resides in this District with an intent to reside indefinitely; (2) Defendant regularly transacts business in this District and is subject to personal jurisdiction here; and (3) a substantial part of the events or omissions giving rise to the claims occurred within this District.

## IV. GENERAL ALLEGATIONS

### 1. *Data Segregation*

31. The information transmitted by the Trackers to the Third Parties falls into two legally distinct categories: the contents of electronic communications and non-content dialing, routing, addressing, and signaling ("DRAS") information. These categories correspond to separate statutory prohibitions under California and federal law, and the allegations in this Complaint distinguish between them accordingly.

32. The "contents" of an electronic communication, as used herein, refers to information that reveals the substance, purport, or meaning of a communication. In the context of web browsing, contents include the full, human-readable URLs that identify the specific articles, blog posts, product pages, and content categories a user is viewing, because those URLs disclose what the user is reading and the nature of the user's interaction with the Website. Contents also include structured event data that describes the user's specific engagement with identified content, such as parameters reflecting that the user viewed a particular article, browsed a particular product category, or navigated between identified pages. The Ninth Circuit has recognized that full-path URLs and referer headers that reveal the particular pages and content a user is viewing constitute "contents" distinguishable from bare routing information. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607-08 (9th Cir. 2020).

33. The full-path URLs transmitted by the Trackers are not abstract network addresses analogous to telephone numbers. A telephone number identifies a line but reveals nothing about the substance of the conversation conducted over that line. By contrast, a URL such as "containerstore.com/blog/posts/black-history-month-2025"

reveals precisely what the user is reading at the moment of transmission. The URL is both the means of accessing the content and a human-readable description of the content itself. A third party that receives this URL in real time, paired with a persistent identifier linking it to a specific browser instance, learns the substance of the user's browsing activity, including the user's interest in specific cultural, social, or commercial topics, without ever needing to access the underlying page. This is functionally equivalent to reading the contents of a letter rather than merely noting the address on the envelope.

34. Non-content DRAS information, by contrast, refers to data that identifies the source, destination, routing, or technical characteristics of a communication without revealing its substance. In the context of web browsing, DRAS information includes Internet Protocol addresses (when used as network-layer routing identifiers), referrer headers (to the extent they identify only the prior domain rather than specific content), timestamps, session-level and persistent identifiers such as cookies and advertising IDs, browser and device characteristics, language and locale settings, and related network metadata. This information identifies where a communication came from, where it is going, and the technical attributes of the device sending it, but does not, standing alone, reveal what the user is reading or doing.

35. Certain data elements may serve both functions depending on context. A full-path URL such as "containerstore.com/blog/posts/juneteenth-2025" is both an addressing element (it identifies a network destination) and content (it reveals that the user is reading an article about Juneteenth). Similarly, an IP address transmitted as an explicit, named parameter within a tracker's payload, such as the Dotomi Tracker's dtm_user_ip field, functions differently from the same IP address when it appears only in the transport-layer headers of an HTTP request. When the IP address is deliberately extracted, packaged, and transmitted as a data field alongside content URLs and persistent identifiers, it constitutes part of the intercepted communication rather than mere routing overhead. Where a data element serves both functions, it supports claims under both § 631 and § 638.51, and the allegations herein identify which theory each

data element supports.

36. For example, during a single page load of the article at "containerstore.com/blog/posts/juneteenth-2025," the Google Tracker simultaneously transmits: (a) the full article URL in the dl parameter, which reveals that the user is reading an article about Juneteenth (contents); and (b) the client identifier in the same request, which is a persistent session-linking token that does not itself reveal what the user is reading (DRAS). Both data elements travel in the same HTTP request to the same Google endpoint, but they serve different functions and implicate different statutory prohibitions. The § 631 and federal Wiretap Act claims are directed at the interception of the former. The § 638.51 claim is directed at the capture of the latter.

**2. *Federal and State Privacy Laws***

**A. California Penal Code § 631 (Wiretapping)**

37. California Penal Code section 631(a) makes it unlawful for any person to, by means of any machine, instrument, or contrivance, or in any other manner, intentionally tap, or make any unauthorized connection with, any telegraph or telephone wire, line, cable, or instrument, or to willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempt to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state.

38. Section 631(a) also prohibits any person from using, or attempting to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or to aid, agree with, employ, or conspire with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned in this subdivision.

39. Section 631 protects the contents of electronic communications from interception by third parties who are not parties to the communication. The statute applies to communications transmitted over the internet, including communications

between a website visitor's browser and the website's server. Courts have recognized that the contents of such communications include the specific substance of what a user reads, views, or engages with on a website, as distinguished from the routing, addressing, and signaling information necessary to facilitate the transmission of those communications.

40. The distinction between protected content and non-content data is critical. A full-path URL that reveals the specific article, topic, or subject matter a user is reading constitutes the contents of a communication because it discloses the substance of the user's browsing activity. By contrast, technical metadata such as timestamps, protocol headers, and session management data that facilitate the transmission of communications, without revealing the substance of what the user is reading, constitute dialing, routing, addressing, or signaling information that falls outside the scope of section 631.

41. Any person who has been injured by a violation of section 631 may bring an action against the person who committed the violation for the greater of five thousand dollars ($5,000) or three times the amount of actual damages sustained by the plaintiff. Cal. Penal Code section 637.2(a).

**B. California Penal Code § 638.51 (Pen Register / Trap and Trace)**

42. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping. The Act has been amended several times and reflects the California Legislature's ongoing commitment to adapting privacy protections to technological advancements.

43. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

44. A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," though it

expressly "does not include any device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by the provider" (Cal. Penal Code § 638.50(b)).

45. Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," but again does not include devices used by a service provider for billing purposes (Cal. Penal Code § 638.50(c)).

46. In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

47. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to a specific line.

48. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could capture the recipient's email address, the sender's IP address, the recipient's IP address, and the subject line, as these are all part of the addressing and routing information of the communication.

49. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address and the subject line, and IP addresses, as these represent the incoming dialing and routing information.

50. The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy are regarded as per se injurious under California law, and CIPA provides a statutory remedy

precisely because such violations, even in the absence of further economic harm, constitute recognized legal injuries.

51. Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have repeatedly recognized that the unauthorized collection and dissemination of personal data constitutes an injury sufficient to support standing and statutory damages.

52. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)). Section 637.2 states that any person who has been injured by any violation of this chapter may bring an action against the person who committed the violation.

**C. Federal Wiretap Act (18 U.S.C. §§ 2510-2522)**

53. The federal Wiretap Act, codified at 18 U.S.C. sections 2510 through 2522, prohibits the intentional interception of any wire, oral, or electronic communication, and provides a private right of action under 18 U.S.C. section 2520 for any person whose communication is intercepted in violation of the Act.

54. Under 18 U.S.C. section 2511(1)(a), it is unlawful for any person to intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication. The term "intercept" is defined at 18 U.S.C. section 2510(4) as the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.

55. The term "contents," as defined at 18 U.S.C. section 2510(8), means any information concerning the substance, purport, or meaning of a communication. Courts in the Ninth Circuit have recognized that full-path URLs identifying specific articles or pages viewed by a website visitor may constitute the contents of an electronic communication for purposes of the Wiretap Act, because such URLs reveal the substance of the user's browsing activity rather than merely the addressing information

necessary to route the communication. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607-08 (9th Cir. 2020).

56. The federal Wiretap Act applies to the same communications at issue in this action. Where a third-party tracking entity, operating code embedded in a website's pages, acquires the contents of communications between the website visitor and the website's server, including full-path URLs identifying specific articles read by the visitor, that acquisition constitutes an interception of an electronic communication within the meaning of the Act. The federal Wiretap Act claims in this action arise from the same course of conduct that gives rise to the section 631 claims, and the legal standard for what constitutes "contents" is materially consistent across both statutes.

57. Any person whose wire, electronic, or oral communication is intercepted in violation of the Act may recover the greater of the sum of actual damages and any profits made by the violator as a result of the violation, or statutory damages of not less than $100 per day for each day of violation or $10,000, whichever is greater. 18 U.S.C. section 2520(c)(2). A prevailing plaintiff may also recover reasonable attorney's fees and other litigation costs reasonably incurred. 18 U.S.C. section 2520(c)(2).

### 3. *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"*

58. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

/ / /

59. In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

60. A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**




61. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

62. The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

63. Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

64. An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

65. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

66. Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet.

---

[1] *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

67. Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

68. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

69. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

70. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

/ / /

71. The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**Figure 2:**




*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

72. Thus, the differences between public and private IP addresses are as follows:[3]

/ / /

/ / /

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br>10.0.0.0 – 10.255.255.255,<br>172.16.0.0 – 172.31.255.255,<br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

73. A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

74. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

75. A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

/ / /

76. A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

77. Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

78. A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

79. In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example,

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

80. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

81. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

82. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

83. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

---

[11] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13] *Id.*

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-willi
ams-z7bhf.

[15] *Id.*

[16] *Id.*

[17] *Id.*

84. The collection of IP addresses here is particularly invasive here: As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

85. In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

86. For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

/ / /

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

87. When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

88. Often times, third-party scripts are installed on websites "for advertising purposes."[21]

89. Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

90. Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

91. As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

92. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

---

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[21] *Id.*

[22] *Id.*

93. Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

94. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**4. *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

95. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness. These transmissions occurred silently, automatically, and without any visual indication to Plaintiff. No disclosure, banner, or mechanism alerted Plaintiff that her device would serve as a communication channel to multiple unrelated advertising and identity-resolution vendors.

96. The third-party transmissions were triggered the moment Plaintiff's browser attempted to load each page, duplicating Plaintiff's outgoing GET and POST requests and routing those signals to multiple advertising and identity-resolution endpoints before the requested pages finished loading or became visible on her device.

97. The Trackers also cause additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

98. This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

99. When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

100. The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some

cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

101. In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

102. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

103. When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

### 5. *Plaintiff And Class Members' Data Has Financial Value*

104. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

105. Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

106. There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

107. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

108. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and

---

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

$150-240 per credit card number or social security number.[27]

109. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

110. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

111. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

### 6. ***Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

112. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

113. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

114. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

115. When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked

across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

### *7. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy*

116. The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

117. As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

118. To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

119. In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

/ / /

/ / /

**a. Data Brokers And Real-Time Bidding: The Information Economy**

*Data Brokers*

120. While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

121. Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a).

122. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

123. For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can

---

[29] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

[30] SHERMAN, *supra*, at 2.

[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

124. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

125. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

126. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

/ / /

---

[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[33] SHERMAN, *supra*, at 1.
[34] *Id.*
[35] *Id.* at 9.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

127. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

/ / /

/ / /

/ / /

[36] *Id.*

[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

**Figure 4:**




128. As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

/ / /

[38] *Id.* at 11.

129. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

130. These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

131. In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

132. As a result of Defendant's installation of trackers operated by data brokers and by numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is linked to existing profiles maintained by those brokers, or used to generate new ones. This linkage occurs through the collection of IP addresses, device metadata, and other user information from the browsers of Defendant's Website visitors.

133. These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data

---

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

134. Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

135. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

136. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[42] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

137. In other words, SSPs provide user information to advertisers that might be interested in those users, a DSP like DoubleClick is the platform on which all of this happens.

138. The RTB process works as follows:

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] *Id.*

[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, DoubleClick]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[44]

**Figure 5:**




139. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

**Figure 6:**




140. In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

141. Likewise, a DSP like DoubleClick can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

142. All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

143. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

a. "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

b. "send[ing] sensitive data across geographic borders."

c. sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[46]

/ / /

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

144. Given DoubleClick operates as a DSP here, the last point is particularly relevant, as it means Google collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

145. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[47]

146. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[48]:

**Figure 7:**




/ / /

---

[47] Geoghegan, *supra*.

[48] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

147. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

148. It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids). The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

149. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[49] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

150. Cookie syncing ("CSync") works as follows:

/ / /

---

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[51]

/ / /

/ / /

/ / /

[51] Papadopoulos, *supra*, at 1433.

**Figure 8:**




151. Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[52]

152. On the flip side, "CSync may re-identify web users even after they delete their cookies."[53] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[54] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to

[52] Papadopoulos, *supra*, at 1434.
[53] *Id.*
[54] *See id.*

abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[55]

153. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[56]

154. The tracking activity at issue does not depend on users remaining anonymous. When the Trackers deployed on the Website execute within a user's browser, they assign and transmit persistent identifiers and related signaling data to their respective third-party operators as part of ordinary analytics, advertising, and session-measurement functions. As a result, the same browser or device can be recognized across multiple pageviews and visits to the Website by those third parties. This persistence allows third-party platforms to associate a user's browsing activity with an identifiable browser or device profile over time, thereby eliminating true anonymity during visits to the Website, even in the absence of account login or user-provided identifying information.

155. To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

/ / /

[55] *Id.*
[56] *Id.* at 1441.

156. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

157. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

158. Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

159. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

160. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

161. Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

162. The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

163. Google LLC, through its DoubleClick and Google Ads advertising infrastructure, operates a programmatic advertising and measurement system that facilitates advertising delivery, attribution, and audience analysis across participating websites. As deployed on Defendant's Website, DoubleClick-related technologies automatically transmit dialing, routing, addressing, and signaling ("DRAS") information generated during users' visits, including referrer headers, timestamps, and Google-assigned persistent or session-level identifiers, to Google-controlled advertising endpoints as part of their ordinary operation. This transmission enables Google to recognize the same browser or device across pageviews and sessions and to associate those interactions with advertising identifiers used within Google's advertising systems, thereby converting page-level navigation signals originating on the Website into advertising measurement, attribution, and audience-classification inputs used for programmatic advertising and campaign optimization.

## V. SPECIFIC ALLEGATIONS

### 1. *"Dialing, Addressing, Routing and Signaling" Allegations*

164. The following allegations are brought pursuant to California Penal Code section 638.51 and concern the installation and use of pen register and trap-and-trace devices or processes on the Website. These allegations incorporate by reference the California Penal Code Section 638.51 (Pen Register and Trap and Trace) section of the General Allegations set forth above. These allegations do not incorporate, and are not intended to be read in conjunction with, the California Penal Code Section 631 or Federal Wiretap Act sections of the General Allegations, or the Content of Communications Specific Allegations set forth below, which concern a legally distinct category of information and are brought under a separate statutory framework.

#### A. *The Google Tracker*s

165. Defendant embedded Google Analytics, Google Tag Manager, Google Ads, and DoubleClick tracking technologies on the Website (collectively, the "Google Trackers"). The Google Trackers automatically execute upon page load and navigation and cause the user's browser to transmit dialing, routing, addressing, and signaling information to Google-controlled servers. The information transmitted includes referrer headers, timestamps, browser and device characteristics, screen resolution, language and locale settings, session-level identifiers, and persistent browser identifiers assigned by Google. Through this operation, the Google Trackers function as pen registers and/or trap-and-trace devices or processes within the meaning of California Penal Code § 638.51.

166. Figure 9 is a Chrome DevTools Network capture showing Google tracking infrastructure activating automatically during the initial page load of the Website. The capture reflects multiple Google-controlled requests firing without user interaction, including loads of Google Tag Manager, Google Analytics libraries, and Google tag and advertising scripts. These requests appear during the earliest page-rendering activity and are not tied to any user click or affirmative action. This figure establishes that Defendant

configured the Website to initiate outbound signaling to Google as part of ordinary page navigation.

**Figure 9:**




167. Figure 10 is a Chrome DevTools Network capture showing the parsed payload of a Google Analytics measurement request transmitted during the same page load. The payload includes structured page-view data such as the event type indicating a page view, browser language, screen and viewport dimensions, a Google-assigned client identifier, a Google Analytics property identifier, and an event timestamp. This request is generated automatically and demonstrates that page-level navigation signals and persistent identifiers are transmitted to Google Analytics as part of the Website's default operation.

/ / /

/ / /

**Figure 10:**




168. Figure 11 is a Fiddler capture showing the raw Google Analytics j/collect request intercepted outside the browser environment. The capture reflects a cross-site POST request to Google Analytics infrastructure and includes headers identifying the Website as the origin and referrer, a full mobile User-Agent string, and language and locale information. The response metadata confirms a successful transaction. This figure independently verifies that the signaling information observed in Figures 9 and 10 actually left the user's device and was received and processed by Google in real time.

/ / /

/ / /

/ / /

**Figure 11:**




169. Figure 12 is a Wireshark DNS capture showing the client device resolving Google-controlled analytics and advertising domains, including Google Analytics and DoubleClick hostnames, to Google infrastructure during the same session. The capture documents DNS queries and responses corresponding to the Google tracking activity observed in Figures 9 through 11. This figure establishes the addressing-layer routing through which the user's device identified and contacted Google servers as destinations for the transmitted signaling information.

/ / /

/ / /

/ / /

**Figure 12:**




170. Taken together, Figures 9 through 12 document the complete operation of the Website's Google tracking functionality. Figure 9 establishes automatic initiation of Google tracking at page load. Figure 10 shows that the tracking requests include structured page-view data and persistent identifiers. Figure 11 confirms that this information is transmitted off the user's device and received by Google-controlled servers. Figure 12 completes the evidentiary chain by showing the addressing and routing steps used to reach Google infrastructure. Collectively, these figures demonstrate that the Website is deliberately configured to generate, package, transmit, and route dialing, routing, addressing, and signaling information to Google as part of ordinary site navigation.

171. As shown by the foregoing, the Google Trackers constitute at least a "process" within the meaning of California Penal Code § 638.51 because they are software mechanisms that automatically capture and transmit dialing, routing, addressing, and signaling information to a third party. They also constitute at least a "device" because their operation depends on execution within the user's browser and

computing hardware.

172. Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Google Trackers or for the capture and transmission of dialing, routing, addressing, and signaling information to Google.

**B. *The Adobe Trackers***

173. Defendant embedded Adobe Experience Cloud tracking technologies on the Website, including Adobe Launch, Adobe Analytics, and Adobe Audience Manager (also known as Demdex) (collectively, the "Adobe Trackers"). The Adobe Trackers automatically execute upon page load and navigation and cause the user's browser to transmit dialing, routing, addressing, and signaling information to Adobe-controlled servers. The information transmitted includes referrer headers, timestamps, browser and device characteristics, language and locale settings, and persistent identifiers assigned by Adobe. Through this operation, the Adobe Trackers function as pen registers and/or trap-and-trace devices or processes within the meaning of California Penal Code § 638.51.

174. Figure 13 is a Chrome DevTools Network capture showing the Adobe Launch JavaScript runtime loading automatically during the initial page load of the Website. The capture reflects a request to assets.adobedtm.com occurring as part of the page's initial request sequence and without any user interaction. Adobe Launch exists for the sole purpose of initializing analytics, profiling, and audience-management modules. Its execution at page load establishes that Defendant configured the Website to activate Adobe tracking infrastructure automatically, prior to any user consent.

/ / /

/ / /

**Figure 13:**




175. Figure 14 is a Chrome DevTools Network capture showing a request to https://dpm.demdex.net/id, Adobe Audience Manager's identity-resolution endpoint. The request includes Adobe Experience Cloud parameters and namespace values used to identify and synchronize visitors across browsing contexts. This endpoint is not required for rendering Website content and exists solely for identity matching and audience management. Its invocation during initial page load evidences pre-consent transmission of signaling and identification data to Adobe.

/ / /

/ / /

/ / /

**Figure 14:**




176. Figure 15 is a Fiddler capture showing the raw outbound Demdex identity request transmitted from the user's browser to Adobe infrastructure. The capture reflects a cross-site request identifying the Website as the origin and referrer and includes language settings and a full mobile User-Agent string. This figure independently confirms that the signaling information generated on the Website actually left the user's device and was received by Adobe-controlled servers in real time.

/ / /

/ / /

/ / /

**Figure 15:**




177. Figure 16 is a Wireshark DNS capture showing the client device resolving Adobe Audience Manager domains, including dpm.demdex.net, through Adobe-controlled and CDN infrastructure. The capture documents DNS resolution and routing occurring contemporaneously with the Demdex requests shown in Figures 14 and 15. This figure establishes the addressing and routing layer through which the user's device identified and contacted Adobe tracking servers.

/ / /

/ / /

/ / /

**Figure 16:**



178. Taken together, Figures 13 through 16 document the complete operation of the Website's Adobe tracking functionality. Figure 13 establishes automatic activation of Adobe tracking at page load. Figure 14 shows that the Website transmits identity-resolution and signaling data to Adobe Audience Manager. Figure 15 confirms that this information is transmitted off the user's device and received by Adobe in real time. Figure 16 completes the evidentiary chain by showing the addressing and routing steps through which the user's device resolves and contacts Adobe-controlled tracking infrastructure. Collectively, these figures demonstrate that the Website is deliberately configured to generate, transmit, and route dialing, routing, addressing, and signaling information to Adobe as part of ordinary site navigation.

179. As shown by the foregoing, the Adobe Trackers constitute at least a "process" within the meaning of California Penal Code § 638.51 because they are software mechanisms that automatically capture and transmit dialing, routing, addressing, and signaling information to a third party. They also constitute at least a "device" because their operation depends on execution within the user's browser and

computing hardware.

180. Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Adobe Trackers or for the capture and transmission of dialing, routing, addressing, and signaling information to Adobe.

**C. *The Pinterest Tracker***

181. Defendant embedded Pinterest tracking technologies on the Website (the "Pinterest Tracker"). The Pinterest Tracker automatically executes upon page load and causes the user's browser to transmit dialing, routing, addressing, and signaling information to Pinterest-controlled servers. The information transmitted includes referrer headers, timestamps, device and browser characteristics, and Pinterest-assigned tracking identifiers. Through this operation, the Pinterest Tracker functions as a pen register and/or trap-and-trace device or process within the meaning of California Penal Code § 638.51.

182. Figure 17 is a Chrome DevTools Network capture showing multiple requests to Pinterest-controlled endpoints, including ct.pinterest.com, firing automatically during the initial page load of the Website. The requests appear in the page's initial network waterfall and are not triggered by any user interaction. This figure establishes that Pinterest tracking infrastructure activates immediately and automatically as part of ordinary page rendering, before any user consent is obtained.

/ / /

/ / /

/ / /

**Figure 17:**




183. Figure 18 is a Chrome DevTools Network capture showing the parsed payload of a Pinterest event request transmitted during the same page load. The payload reflects a structured "pagevisit" event and includes Pinterest tracking identifiers, event timestamps and embedded commercial metadata such as product or category information associated with the viewed content. This figure evidences that the Pinterest Tracker transmits detailed behavioral and contextual information describing the user's activity on the Website—information not required for page functionality and characteristic of advertising analytics and profiling.

/ / /

/ / /

/ / /

**Figure 18:**




184. Figure 19 is a Fiddler capture showing the raw outbound Pinterest tracking request transmitted from the user's browser to Pinterest infrastructure. The capture reflects a cross-site request identifying the Website as the origin and referrer and includes a full mobile User-Agent string, language and locale settings, and other header-level signaling information. The response metadata confirms that the request was received and processed by Pinterest-controlled servers. This figure independently confirms that the signaling information generated on the Website actually left the user's device and was transmitted to Pinterest in real time.

/ / /

/ / /

/ / /

**Figure 19:**




185. Figure 20 is a Wireshark DNS capture showing the client device resolving Pinterest-related domains, including ct.pinterest.com and related Pinterest infrastructure hostnames, during the same session. The capture documents DNS queries and responses contemporaneous with the tracking requests shown in Figures 17 through 19. This figure establishes the addressing and routing layer through which the user's device identified and contacted Pinterest servers as destinations for the transmitted signaling information.

/ / /

/ / /

/ / /

**Figure 20:**




186. Taken together, Figures 17 through 20 document the complete operation of the Website's Pinterest tracking functionality within the advertising and analytics ecosystem. Figure 17 establishes automatic activation of Pinterest tracking at page load. Figure 18 shows that the tracking requests include structured behavioral and commercial context data associated with the user's activity. Figure 19 confirms that this information is transmitted off the user's device to Pinterest-controlled servers in real time. Figure 20 completes the evidentiary chain by showing the addressing and routing steps through which the user's device resolves and contacts Pinterest tracking infrastructure. Collectively, these figures demonstrate that the Website is deliberately configured to generate, package, transmit, and route dialing, routing, addressing, and signaling information from users' browsers to Pinterest as part of ordinary site navigation.

187. As shown by the foregoing, the Pinterest Tracker constitutes at least a "process" within the meaning of California Penal Code § 638.51 because it is a software mechanism that automatically captures and transmits dialing, routing, addressing, and signaling information to a third party. It also constitutes at least a "device" because its

operation depends on execution within the user's browser and computing hardware.

188. Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Pinterest Tracker or for the capture and transmission of dialing, routing, addressing, and signaling information to Pinterest.

**D. *The TikTok Tracker***

189. Defendant embedded TikTok tracking and advertising measurement technologies on the Website (the "TikTok Tracker"). The TikTok Tracker automatically executes upon page load and causes the user's browser to transmit dialing, routing, addressing, and signaling information to TikTok-controlled servers. The information transmitted includes referrer headers, timestamps, device and browser characteristics, and TikTok-assigned advertising identifiers. Through this operation, the TikTok Tracker functions as a pen register and/or trap-and-trace device or process within the meaning of California Penal Code § 638.51.

190. Figure 21 is a Chrome DevTools Network capture showing TikTok Pixel JavaScript libraries loading automatically during the initial page load of the Website. The capture reflects requests to TikTok-controlled endpoints, including analytics.tiktok.com/i18n/pixel/static/…, which appear in the initial network waterfall and are not triggered by any user interaction. This figure establishes that TikTok tracking infrastructure is initialized immediately as part of ordinary page rendering, before any user consent is obtained.

/ / /

/ / /

/ / /

**Figure 21:**




191. Figure 22 is a Fiddler capture showing a raw outbound TikTok Pixel event request transmitted from the user's browser to TikTok analytics infrastructure. The capture reflects a POST request to https://analytics.tiktok.com/api/v2/pixel containing a structured advertising measurement payload, including a PageView event designation, a TikTok-assigned pixel identifier and device and browser context metadata. This figure provides direct application-layer proof that the Website transmits behavioral and identifying information to TikTok for advertising measurement purposes.

/ / /

/ / /

/ / /

**Figure 22:**




192. Figure 23 is a Fiddler capture showing the request headers associated with the TikTok Pixel POST request. The headers identify the Website as the origin and referrer and include language and locale settings, a detailed mobile User-Agent string, and a cross-site execution context. This figure confirms that, in addition to payload data, header-level signaling information identifying the source website, device, and environment is transmitted to TikTok-controlled servers in real time.

/ / /

/ / /

/ / /

**Figure 23:**




193. Figure 24 is a Wireshark DNS capture showing the client device resolving TikTok analytics domains, including analytics.tiktok.com, during the same browsing session. The capture documents DNS queries and responses contemporaneous with the tracking requests shown in Figures 21 through 23 and reflects routing through TikTok-controlled and CDN infrastructure. This figure establishes the addressing and routing layer through which the user's device identified and contacted TikTok servers as destinations for the transmitted signaling information.

/ / /

/ / /

/ / /

**Figure 24:**




194. Taken together, Figures 21 through 24 document the complete operation of the Website's TikTok tracking functionality within the advertising and analytics ecosystem. Figure 21 establishes automatic activation of TikTok tracking at page load. Figure 22 shows that the tracking requests include structured advertising measurement events and contextual information describing the user's activity. Figure 23 confirms that source-identifying, device-level, and locale-specific signaling information is transmitted off the user's device to TikTok-controlled servers. Figure 24 completes the evidentiary chain by showing the addressing and routing steps through which the user's device resolves and contacts TikTok tracking infrastructure. Collectively, these figures demonstrate that the Website is deliberately configured to generate, package, transmit, and route dialing, routing, addressing, and signaling information from users' browsers to TikTok as part of ordinary site navigation.

195. As shown by the foregoing, the TikTok Tracker constitutes at least a "process" within the meaning of California Penal Code § 638.51 because it is a software mechanism that automatically captures and transmits dialing, routing, addressing, and

signaling information to a third party. It also constitutes at least a "device" because its operation depends on execution within the user's browser and computing hardware.

196. Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the TikTok Tracker or for the capture and transmission of dialing, routing, addressing, and signaling information to TikTok.

**E. *The AGKN Tracker***

197. Defendant embedded AGKN tracking technologies on the Website (the "AGKN Tracker"). The AGKN Tracker automatically executes upon page load and causes the user's browser to transmit dialing, routing, addressing, and signaling information to AGKN-controlled servers. Unlike typical analytics or advertising trackers that rely on inferred network-layer addressing, the AGKN Tracker explicitly transmits the visitor's Internet Protocol ("IP") address as a URL parameter, together with device identifiers, and persistent tracking cookies. Through this operation, the AGKN Tracker functions as a pen register and/or trap-and-trace device or process within the meaning of California Penal Code § 638.51.

198. Figure 25 is a Fiddler capture showing an outbound AGKN pixel request transmitted automatically during the initial page load of the Website. The capture reflects a GET request to https://d.agkn.com/pixel/10751/ that explicitly includes the visitor's IP address as a query-string parameter, along with timestamp and page-context parameters. This figure constitutes direct, application-layer evidence that Defendant configured the Website to acquire and transmit network-level IP addressing information to a third party as part of ordinary page navigation, prior to any user consent.

/ / /

/ / /

**Figure 25:**




199. Figure 26 is a Fiddler capture showing the request headers accompanying the AGKN pixel transmission. The headers identify the Website as the origin and referrer and include a detailed mobile User-Agent string, language and locale settings, and a cross-site execution context. This figure establishes that the explicitly transmitted IP address is bound to a specific website, device, browser, and language profile, converting raw addressing information into source-identified signaling data transmitted to AGKN-controlled infrastructure.

/ / /

/ / /

/ / /

**Figure 26:**




200. Figure 27 is a Chrome DevTools Application-tab capture showing AGKN cookies stored in the user's browser during the same session, including persistent identifiers labeled "ab" and "u." These cookies are scoped to the agkn.com domain and persist beyond the initial page view. This figure demonstrates that the IP-bearing transmission shown in Figures 25 and 26 is part of a persistent tracking system designed to recognize and correlate the same browser or device across sessions, rather than an isolated or incidental request.

/ / /

/ / /

/ / /

**Figure 27:**




201. Figure 28 is a Wireshark DNS capture showing the client device resolving AGKN tracking domains, including d.agkn.com, during the same page-load interval. The capture documents DNS resolution and routing through AGKN-controlled and CDN infrastructure contemporaneous with the IP-bearing pixel request. This figure establishes the addressing and routing steps through which the user's device identified and contacted AGKN servers as the destination for the transmitted signaling information.

/ / /

/ / /

/ / /

**Figure 28:**




202. Taken together, Figures 25 through 28 document the complete operation of the Website's AGKN tracking functionality. Figure 25 establishes explicit acquisition and transmission of the visitor's IP address at the application layer. Figure 26 shows that the IP address is transmitted together with source-identifying and device-level metadata. Figure 27 confirms the use of persistent AGKN identifiers to enable ongoing recognition and correlation. Figure 28 completes the evidentiary chain by showing the routing and addressing steps required to deliver the IP-bearing request to AGKN-controlled infrastructure. Collectively, these figures demonstrate that the Website is deliberately configured to generate, package, transmit, and route dialing, routing, addressing, and signaling information, ***including explicit IP addresses***, from users' browsers to AGKN as part of ordinary page navigation.

203. As shown by the foregoing, the AGKN Tracker constitutes at least a "process" within the meaning of California Penal Code § 638.51 because it is a software mechanism that automatically captures and transmits dialing, routing, addressing, and signaling information to a third party. It also constitutes at least a "device" because its

operation depends on execution within the user's browser and computing hardware.

204. Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the AGKN Tracker or for the explicit capture and transmission of their IP addresses and associated signaling information to AGKN.

***2. "Content of Communication" Allegations***

205. The following allegations are brought pursuant to California Penal Code section 631 and 18 U.S.C. section 2511 and concern the interception of the contents of Plaintiff's and Class Members' electronic communications with the Website. These allegations incorporate by reference the Data Segregation, California Penal Code Section 631, and Federal Wiretap Act sections of the General Allegations set forth above. These allegations do not incorporate, and are not intended to be read in conjunction with, the pen register and trap-and-trace specific allegations set forth in the preceding section, which concern a legally distinct category of information and are brought under a separate statutory framework

**A. *The Google Trackers***

206. Defendant embedded and deployed Google Analytics 4 and the Google advertising stack on the Website, analytics and advertising platforms operated by Google LLC. The Google Analytics tracking code, once loaded in a visitor's browser, intercepts the URL of each page visited and transmits it, together with a persistent client identifier, to Google's collection endpoints in real time and without user interaction, from which the data is further routed to Google's advertising infrastructure.

207. Figure 29 shows a Google Analytics payload transmitted during a page load of the Juneteenth article on the Website. The request includes: (a) the full URL of the article page being visited in the dl (document location) parameter, https://www.containerstore.com/blog/posts/juneteenth-2025; (b) the page title in the dt (document title) parameter; (c) a persistent cid (client ID), a numeric identifier assigned

by Google to the individual browser and used to track that visitor across sessions and Google properties; and (d) the privacy-signaling parameter npa=0, indicating that personalized advertising was enabled for the session. The request is keyed to a Google Analytics Measurement ID assigned to the Website.

**Figure 29:**




208. Figure 30 shows a request to a Google Ads / DoubleClick endpoint transmitted during a page load of the Black History Month article on the Website. The request includes a full, human-readable blog post URL for the article https://www.containerstore.com/blog/posts/black-history-month-2025 in the query parameters, along with referrer information showing navigation between specific content pages. This confirms that content-specific browsing data is transmitted not only to Google's analytics infrastructure but also to Google's advertising infrastructure.

/ / /

/ / /

**Figure 30:**




209. Figure 31 shows the cookies stored in the browser during the browsing session on the Website. Google's persistent identifiers _ga, _gid, and _gcl_au are stored on the containerstore.com domain. These identifiers tie each subsequent HTTP request from the browser back to the same visitor record within Google's tracking infrastructure, confirming that Google's interception of the page URL is linked to a persistent, cross-session profile.

/ / /

/ / /

/ / /

**Figure 31:**




210. Google LLC and its operators used the intercepted browsing data, including the full URLs reflecting the specific content navigated by visitors to the Website, together with persistent client identifiers, to build and maintain individual user profiles, serve targeted advertising through Google's advertising network, and conduct behavioral analytics, including as to Plaintiff and the Proposed Class.

211. Google LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and diverted the contents of those communications to its own servers and advertising infrastructure for its own commercial purposes.

212. By causing Google LLC to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631(a) and 18 U.S.C. § 2511.

**B. *The Facebook Tracker***

213. Defendant embedded and deployed the Facebook Pixel on the Website, a tracking and advertising measurement platform operated by Meta Platforms, Inc. The

Facebook Pixel, once loaded in a visitor's browser, intercepts the URL of each page visited and transmits it, together with a persistent browser identifier, to Facebook's tracking endpoint at https://www.facebook.com/tr in real time and without user interaction.

214. Figure 32 shows a Facebook PageView event transmitted during a page load of the Black History Month article on the Website. The request includes: (a) the full URL of the article page being visited in the dl (document location) parameter, https://www.containerstore.com/blog/posts/black-history-month-2025; (b) the rl (referrer location) parameter showing the referring page within the site's blog structure; and (c) a persistent fbp identifier, a Facebook-assigned browser identifier used to associate the visitor's activity across pages and sessions.

**Figure 32:**




215. Figure 33 shows the _fbp cookie stored in the browser under the containerstore.com domain during the same browsing session. The cookie value contains the persistent Facebook-linked identifier transmitted in the PageView request. The storage of this identifier on the Website's domain confirms that Facebook maintains a persistent tracking presence in the browser and can associate multiple page visits with

the same browser instance.

**Figure 33:**



216. Figure 34 shows a Fiddler capture of the raw HTTP GET request to https://www.facebook.com/tr. The request URL includes query parameters indicating a PageView event and contains the full, human-readable blog post URL for the Black History Month article. Request headers show the Referer as https://www.containerstore.com and include a complete User-Agent string describing the browser and operating system. This independently corroborates the DevTools evidence.

/ / /

/ / /

/ / /

**Figure 34:**




217. Meta Platforms, Inc. and its operators used the intercepted browsing data, including the full URLs reflecting the specific content navigated by visitors to the Website, together with persistent browser identifiers, to build and maintain individual user profiles, serve targeted advertising through Facebook's advertising network, and conduct behavioral analytics, including as to Plaintiff and the Proposed Class.

218. Meta Platforms, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and diverted the contents of those communications to its own servers and advertising infrastructure for its own commercial purposes.

219. By causing Meta Platforms, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code section 631(a) and 18 U.S.C. section 2511.

### C. *The Pinterest Tracker*

220. Defendant embedded and deployed Pinterest tracking technologies on the Website, an advertising measurement and conversion-tracking platform operated by

Pinterest, Inc. The Pinterest tracking code, once loaded in a visitor's browser, intercepts the URL of each page visited and transmits it, together with a persistent visitor identifier, to Pinterest's tracking endpoint at https://ct.pinterest.com/v3 in real time and without user interaction.

221. Figure 35 shows a Pinterest pagevisit event transmitted during a page load on the Website. The request includes: (a) the full URL of the page being visited in the ad.loc parameter, transmitted as a JSON object containing human-readable URLs identifying specific blog content; (b) the referring page URL in the ad.ref parameter, showing navigation between specific content pages; and (c) a persistent external_id, a SHA-256 hash identifier assigned to the visitor and used to associate the visitor's activity across pages and sessions.

**Figure 35:**




222. Figure 36 shows the _pin_unauth cookie stored in the browser under the containerstore.com domain during the same browsing session. The cookie value contains a persistent Pinterest-linked identifier. The storage of this identifier confirms that Pinterest maintains a persistent tracking presence in the browser and can associate multiple page visits with the same browser instance.

**Figure 36:**




223. Figure 37 shows a Fiddler capture of the raw HTTP GET request to https://ct.pinterest.com/v3. The request URL includes parameters indicating a pagevisit event and contains encoded, human-readable blog URLs. Request headers show the Origin and Referer as https://www.containerstore.com and include a complete User-Agent string. This independently corroborates the DevTools evidence.

/ / /

/ / /

/ / /

**Figure 37:**




224. Pinterest, Inc. and its operators used the intercepted browsing data, including the full URLs reflecting the specific content navigated by visitors to the Website, together with persistent visitor identifiers, to build and maintain individual user profiles, serve targeted advertising through Pinterest's advertising network, and conduct behavioral analytics, including as to Plaintiff and the Proposed Class.

225. Pinterest, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and diverted the contents of those communications to its own servers and advertising infrastructure for its own commercial purposes.

226. By causing Pinterest, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code section 631(a) and 18 U.S.C. section 2511.

**D. *The Dotomi Tracker***

227. Defendant embedded and deployed Dotomi tracking technologies on the Website, a cross-device identity resolution and advertising platform operated by Dotomi,

Inc. The Dotomi tracking code, once loaded in a visitor's browser, intercepts the URL of each page visited and transmits it, together with the visitor's raw public IP address as a named application-layer parameter and persistent cookie-based identifiers, to Dotomi's servers at https://login-ds.dotomi.com in real time and without user interaction.

228. Figure 38 shows the query string parameters of a Dotomi request transmitted during a page load on the Website. The request includes: (a) the canonical_url parameter containing the human-readable URL https://www.containerstore.com/blog/categories/charitable-and-cultural/, identifying the specific content category the visitor is browsing; (b) the dtm_ref parameter showing the prior/referrer page URL path; (c) device and browser metadata fields including dtm_user_agent; (d) the dtm_state parameter identifying the visitor's state as California; and (e) the parameter dtm_user_ip=, the visitor's raw, unmasked public IP address transmitted as a named application-layer parameter within the tracking request itself. The co-transmission of a content-identifying URL, the visitor's geographic state, and the visitor's raw IP address within a single request establishes that Dotomi received both the substance of what the visitor was reading and sufficient information to identify the visitor personally.

/ / /

/ / /

/ / /

**Figure 38:**




229. Figure 39 shows a Fiddler capture of the raw HTTP GET request to https://login-ds.dotomi.com/profile/visit/final/js. The request URL contains a long, URL-encoded query string that includes the Container Store page URL context, session and consent parameters, and the Referer header identifying https://www.containerstore.com/ as the origin. This independently corroborates the DevTools evidence and confirms that the human-readable page context and visitor data leave the browser to Dotomi over the network.

/ / /

/ / /

/ / /

**Figure 39:**




230. Figure 40 shows the cookies stored in the browser for Dotomi-related domains during the same browsing session, including DotomiConsent, DotomiSession, and DotomiUser. On information and belief, the DotomiUser and DotomiConsent cookies persist, confirming that Dotomi maintains long-lived persistent identifiers in the browser cookie store that can be used to associate the visitor's browsing activity across sessions and over time.

/ / /

/ / /

/ / /

**Figure 40:**




231. Dotomi, Inc. and its operators used the intercepted browsing data, including the URLs reflecting the specific content navigated by visitors to the Website, the visitor's raw public IP address, and persistent cookie-based identifiers, to conduct cross-device identity resolution, build and maintain individual user profiles, and serve targeted advertising, including as to Plaintiff and the Proposed Class.

232. Dotomi, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and diverted the contents of those communications to its own servers for its own commercial purposes.

233. By causing Dotomi, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code section 631(a) and 18 U.S.C. section 2511.

**E. The Trackers Read Content in Transit**

234. As shown in Figures 29, 32, 35, and 38 above, the network requests from Google, Facebook, Pinterest, and Dotomi are initiated automatically at page load, without any user interaction, contemporaneously with the delivery of the Website's

content to the visitor's browser. The tracking code embedded in the Website by Defendant executes as part of the same page-load sequence that delivers the requested content to the visitor's browser, causing the visitor's browser to transmit the full URLs of the pages being viewed to third-party servers while the communication between the visitor and the Website is still in progress. The interceptions are concurrent with, and not subsequent to, the delivery of the Website's content to the visitor.

## VI. CLASS ALLEGATIONS

235. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

236. Plaintiff further defines two subclasses:

- The "Content Interception Subclass," consisting of all persons within California whose browser was subject to installation, execution, embedding, or injection of the Google Trackers, the Facebook / Meta Pixel Tracker, the Pinterest Tracker, or the Dotomi Tracker by the Defendant's Website during the relevant statute of limitations period, and whose electronic communications with the Website, including full-path URLs identifying specific content viewed, were intercepted and transmitted to third parties without consent.
- (b) The "Pen Register Subclass," consisting of all persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period, and whose dialing, routing, addressing, or signaling information was captured and transmitted to third parties without consent or a court order.

237. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

238. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers intercept the contents of electronic communications between Plaintiff and Class Members and the Website within the meaning of California Penal Code section 631;
- Whether the Trackers intercept electronic communications within the meaning of 18 U.S.C. section 2511;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by California Penal Code section 638.51;
- Whether the full-path URLs transmitted by the Trackers to third parties constitute the contents of electronic communications;
- Whether Plaintiff and Class Members are subject to the same tracking policies and practices;
- Whether Defendant violated California Penal Code section 631;
- Whether Defendant violated 18 U.S.C. section 2511;
- Whether Defendant violated California Penal Code section 638.51;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained;

- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice; and
- Whether Plaintiff and the Class Members are entitled to equitable relief for unjust enrichment.

239. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

240. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

241. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII. <u>FIRST CAUSE OF ACTION</u>

### Violations of 18 U.S.C. § 2511 (Federal Wiretap Act)

### By Plaintiff and the Content Interception Subclass Against All Defendants

242. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein, except as to those allegations regarding claims based on Dialing, Routing, Addressing and Signaling information.

243. Plaintiff brings this cause of action individually and on behalf of the members of the Content Interception Subclass against Defendant.

244. During the relevant statute of limitations period, Defendant intentionally caused the interception of electronic communications between Plaintiff and Class Members and the Website by embedding and deploying third-party tracking technologies, including the Google Trackers, the Facebook / Meta Pixel Tracker, the Pinterest Tracker, and the Dotomi Tracker, on the Website.

245. The intercepted communications included the contents of Plaintiff's and Class Members' electronic communications with the Website, including full-path URLs identifying specific articles, content categories, and subject matter that Plaintiff and Class Members read or viewed on the Website. These URLs reveal the substance, purport, or meaning of Plaintiff's and Class Members' communications with the Website and constitute "contents" within the meaning of 18 U.S.C. section 2510(8).

246. The interception was accomplished through the use of electronic devices and processes, specifically client-side JavaScript code embedded in the Website by Defendant, which caused Plaintiff's and Class Members' browsers to transmit the contents of their communications with the Website to third-party servers operated by Google LLC, Meta Platforms, Inc., Pinterest, Inc., and Dotomi, Inc. in real time, contemporaneously with the delivery of the Website's content to Plaintiff's and Class Members' browsers, and without Plaintiff's or Class Members' knowledge or consent.

247. Google LLC, Meta Platforms, Inc., Pinterest, Inc., and Dotomi, Inc. are not parties to the communications between Plaintiff and the Website. They are third-party interceptors that acquired the contents of Plaintiff's and Class Members' electronic communications through devices and processes embedded in the Website by Defendant.

248. Defendant did not obtain Plaintiff's or Class Members' consent for the interception and transmission of the contents of their electronic communications with the Website to third parties.

249. As a direct and proximate result of Defendant's violations of 18 U.S.C. section 2511, Plaintiff and the Content Interception Subclass have suffered injury and are entitled to recover the greater of actual damages or statutory damages of not less than

$10,000 per violation, together with reasonable attorney's fees and other litigation costs reasonably incurred, pursuant to 18 U.S.C. section 2520.

## VIII. SECOND CAUSE OF ACTION

### Violations of Cal. Penal Code § 631 (Wiretapping)

### By Plaintiff and the Content Interception Subclass Against All Defendants

250. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein, except as to those allegations regarding claims based on Dialing, Routing, Addressing and Signaling information.

251. Plaintiff brings this cause of action individually and on behalf of the members of the Content Interception Subclass against Defendant.

252. During the relevant statute of limitations period, Defendant, by means of a machine, instrument, or contrivance, and in an unauthorized manner, caused third parties to read and learn the contents of electronic communications between Plaintiff and Class Members and the Website while those communications were in transit.

253. Specifically, Defendant embedded and deployed third-party tracking technologies on the Website, including the Google Trackers, the Facebook / Meta Pixel Tracker, the Pinterest Tracker, and the Dotomi Tracker. These technologies caused Plaintiff's and Class Members' browsers to transmit the full-path URLs identifying specific articles, content categories, and subject matter that Plaintiff and Class Members read or viewed on the Website to third-party servers operated by Google LLC, Meta Platforms, Inc., Pinterest, Inc., and Dotomi, Inc. The transmissions occurred in real time, contemporaneously with the delivery of the Website's content to Plaintiff's and Class Members' browsers, and without Plaintiff's or Class Members' consent.

254. The full-path URLs transmitted by the Trackers constitute the contents of Plaintiff's and Class Members' electronic communications with the Website because they reveal the substance of what Plaintiff and Class Members were reading, viewing, or engaging with on the Website, as distinguished from the routing, addressing, and signaling information necessary to facilitate the transmission of those communications.

255. Google LLC, Meta Platforms, Inc., Pinterest, Inc., and Dotomi, Inc. are not parties to the communications between Plaintiff and the Website. Defendant willfully and without the consent of all parties to the communication caused these third parties to read and learn the contents of Plaintiff's and Class Members' communications while those communications were in transit.

256. Defendant did not obtain Plaintiff's or Pen Register Sublcass Members' consent for the interception, reading, or learning of the contents of their electronic communications with the Website.

257. As a direct and proximate result of Defendant's violations of California Penal Code section 631, Plaintiff and the Content Interception Subclass have suffered injury and are entitled to recover the greater of five thousand dollars ($5,000) or three times the amount of actual damages sustained, pursuant to California Penal Code section 637.2(a).

## IX. THIRD CAUSE OF ACTION

**Violations of Cal. Penal Code § 638.51**

***By Plaintiff and the Pen Register Subclass Against All Defendants***

258. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein, except as to those based on the content of communications.

259. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

260. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

/ / /

261. The Trackers recorded Plaintiff's dialing, routing, addressing, and signaling information in real time, automatically transmitting this dialing, routing, addressing and signaling data to multiple third-party ad-tech endpoints before the Webpage fully loaded.

262. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## X. <u>FOURTH CAUSE OF ACTION</u>

### Violations of Cal. Constitution Article I § 1

***By Plaintiff and the Class Members Against All Defendants***

263. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

264. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

265. Article I, Section 1 of the California Constitution guarantees each individual an inalienable right to privacy. This constitutional provision supports a private right of action against both governmental and private actors who engage in conduct that constitutes a serious invasion of privacy.

266. Plaintiff and the Class Members possess a legally protected privacy interest in the confidentiality of their online behavior, communications metadata, and identifying information, including but not limited to: IP address, browser details, session identifiers, page visit patterns, communication content and clickstream behavior.

267. Plaintiff and the Class Members had a reasonable expectation that their activity on Defendant's website, including what pages were visited, what content was interacted with, and when, would not be secretly tracked and transmitted to third parties via embedded surveillance code.

268. Without Plaintiff's or the Class Members' knowledge or consent, Defendant caused the Trackers to be deployed on the Website. The Trackers secretly transmitted Plaintiff's communication content and digital signaling data, addressing information (e.g., URLs accessed), and routing metadata (e.g., timestamps and referral paths) to the Third Parties, enabling behavioral profiling and cross-site identification.

269. Defendant's conduct constitutes a serious and egregious invasion of Plaintiff's and the Class Members' informational privacy, far exceeding any routine or incidental data handling. The deployment of real-time surveillance tools designed to accomplish identity resolution and behavioral mapping is highly offensive to a reasonable person.

270. Defendant lacked any legitimate justification for failing to disclose or obtain consent for this data interception and transfer. The magnitude of the privacy intrusion outweighed any speculative or commercial benefit to Defendant.

271. As a direct and proximate result of Defendant's actions, Plaintiff and the Class Members have suffered a loss of control over personal data, emotional distress, and a violation of their constitutional right to privacy.

## XI. FIFTH CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

***By Plaintiff and the Class Members Against All Defendants***

272. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

273. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

274. This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

275. Defendant has engaged in unlawful business practices by:

- (a) Violating 18 U.S.C. § 2511 by intentionally causing the interception of the

contents of Plaintiff's and Class Members' electronic communications with the Website, including full-path URLs identifying specific articles and content viewed, and transmitting those contents to third parties without consent;

- (b) Violating California Penal Code § 631 by causing third parties to read and learn the contents of Plaintiff's and Class Members' electronic communications with the Website while those communications were in transit, without the consent of all parties to the communication;
- (c) Violating California Penal Code §§ 638.50-638.56, including the unauthorized collection of dialing, routing, addressing, and signaling information for user identification and tracking; and
- (d) Violating Article I, Section 1 of the California Constitution, which protects individuals from serious invasions of privacy.

276. Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of both the contents of Plaintiff's and Class Members' electronic communications with the Website, including the specific articles and content categories they viewed, and their personal and behavioral information, such as IP addresses, browser details, referrer paths, timestamps, and interaction events, to third parties including Google LLC, Meta Platforms, Inc., Pinterest, Inc., and Dotomi, Inc.

277. The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm they cause to consumers, including loss of control over personal information, exposure of sensitive browsing activity to third-party advertising networks, and risk of profiling, outweighs any legitimate business justification.

278. Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices. On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that the contents of their communications with the Website, including the specific

articles and content they viewed, would be intercepted and transmitted to third-party advertising and analytics platforms, or that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

279. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data. Plaintiff's and Class Members' data, used for targeted advertising, behavioral modeling, and enrichment by third parties, constitutes digital property with measurable economic value.

280. Plaintiff on behalf of herself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of herself and on behalf of the Class Members also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## XII. SIXTH CAUSE OF ACTION

### Intrusion Upon Seclusion

***By Plaintiff and the Class Members Against All Defendants***

281. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

282. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant for intrusion upon seclusion, a well-established common law tort recognized in California, which protects individuals from intentional invasions of their private affairs in a manner that would be highly offensive to a reasonable person.

283. At all relevant times, Plaintiff and the Class Members had a reasonable expectation of privacy in their online browsing activity, including their interactions with the Website, the specific content viewed, the communications, and the behavioral signals generated through use of the website, such as page views, click paths, session timestamps, and form entries.

284. Without Plaintiff's or Class Members' knowledge or consent, Defendant intentionally deployed the Trackers on the Website. This tool was engineered to surreptitiously capture and transmit the content of communications and granular behavioral data, including addressing, signaling, and routing information such as IP addresses, referrers, device attributes, and mouse activity, to third parties.

285. The data collected was detailed and persistent, enabling Third Parties to monitor Plaintiff's and Class Members' conduct across websites, associate that behavior with unique identifiers, and build a behavioral profile of Plaintiff and Class Members for marketing and data monetization purposes.

286. Defendant's actions were intentional, systematic, and designed to operate in a manner undetectable by users. At no point did Defendant provide clear, conspicuous disclosure of this surveillance, nor did it obtain affirmative consent from Plaintiff and Class Members to conduct such monitoring or transmit the collected data to third parties.

287. The nature of this covert surveillance, especially its capacity to link online activity to identifiable users, would be highly offensive to a reasonable person, particularly in light of growing public sensitivity to privacy rights and digital surveillance.

288. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members suffered an invasion of privacy, loss of control over personal information, and emotional harm, including anxiety, indignity, and concern over being unknowingly tracked, profiled, and exposed to targeted advertising based on private digital conduct.

289. Defendant's conduct was willful, malicious, and oppressive, thereby

justifying the imposition of punitive and exemplary damages.

## XIII. SEVENTH CAUSE OF ACTION

### Unjust Enrichment

***By Plaintiff and the Class Members Against All Defendants***

290. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

291. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant for unjust enrichment, asserting that Defendant has been unjustly enriched through the unauthorized and uncompensated acquisition, use, and monetization of Plaintiff's and Class Members' personal data.

292. Plaintiff and the Class Members, while visiting and interacting with the Website, unknowingly conferred a substantial benefit on Defendant by generating digital behavioral data, including but not limited to the content of communication, IP addresses, device information, browser metadata, session timestamps, and interaction signals.

293. Defendant deployed the Trackers without Plaintiff's and Class Members' knowledge or meaningful consent. The data collected was then used by Defendant and/or third parties to conduct behavioral targeting, analytics, and advertising optimization that generated substantial financial value.

294. At no time did Plaintiff and Class Members consent to the commercial exploitation of this data. Nor was Plaintiff and Class Members informed that their online behavior would be tracked and monetized in this manner. Plaintiff and Class Members received no compensation, disclosure, or opportunity to prevent the enrichment conferred upon Defendant.

295. Defendant's retention and use of this benefit was unjust and inequitable. The value of Plaintiff's and Class Members' behavioral data, when compiled, analyzed, and integrated into advertising algorithms or consumer profiling tools, constitutes a marketable asset in the digital economy. Defendant's ability to extract revenue from this asset without disclosure or fair exchange renders its conduct unjust.

296. Under principles of equity and good conscience, Defendant should be required to disgorge all ill-gotten gains and benefits received as a result of its unjust enrichment at Plaintiff's and Class Members' expense.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class and the Content Interception and Pen Register Subclasses, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates 18 U.S.C. § 2511, California Penal Code § 631, California Penal Code § 638.51, the California Constitution, and Business & Professions Code § 17200;
3. An order declaring that Defendant's conduct unlawfully intrudes upon the seclusion of Plaintiff and the Class Members;
4. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;
5. An order enjoining Defendant's conduct as alleged herein;
6. Disgorgement of profits resulting from unjust enrichment;
7. Statutory damages pursuant to 18 U.S.C. § 2520;
8. Statutory damages pursuant to California Penal Code § 637.2;
9. Prejudgment interest;
10. Reasonable attorney's fees and costs, including pursuant to 18 U.S.C. § 2520; and
11. All other relief that would be just and proper as a matter of law or equity.

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: April 21, 2026 **NATHAN & ASSOCIATES, APC**

By: */s/ Reuben D. Nathan*

Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*